**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 17-cv-01553-RM-SKC

UNITED STATES OF AMERICA,

Plaintiff,

v.

8.11 ACRES OF LAND, MORE OR LESS
IN THE COUNTY OF GRAND, COLORADO; and
LAMBRIGHT, LLC, et al.,

Defendants.

---

## ORDER

---

This action has been filed by the United States under its powers of eminent domain on behalf of the Western Area Power Association in connection with the Granby Pumping Plant - Windy Gap Transmission Line Rebuild project. The United States condemned approximately 8.11 acres that are a part of a larger parcel of land owned by Defendant Lambright, LLC ("Lambright") in Grand County. Before the Court now are three motions filed by the United States challenging the admissibility of certain testimony concerning the market value of the property taken. Those motions are as follows: (1) the United States' Motion to Exclude Certain Comparable Sales in the Appraisal of David B. Clayton (ECF No. 65); (2) the United States' Motion to Exclude Case Studies and Paired Sales Analysis of Appraiser David Clayton (ECF No. 66); and (3) the United States' Motion to Exclude Landowner Valuation Evidence Premised on Speculative Residential Use (ECF No. 67). The motions are fully briefed and ripe for determination.

# I. BACKGROUND

On June 30, 2017 (the "Date of Taking"), the United States condemned a transmission line easement and an access easement encumbering approximately 8.11 acres of land.[1] The 8.11 acres are located on an approximately 154-acre parcel owned by Lambright (sometimes called the "Larger Parcel").[2] At the time of the taking, the Larger Parcel was already encumbered by two pre-existing easements benefiting the United States.[3] The new transmission line easement generally follows the same centerline as the two pre-existing easements, but expands it from 30 feet to 100 feet.

Lambright acquired the Larger Parcel in 2000. Between 2000 and 2005, Lambright developed plans for an approximately 72-lot residential subdivision of the Larger Parcel, with lots ranging between one-half acre to five acres. (Lambright Depo., ECF No. 95:15-16; ECF No. 67-4.) In 2005, Lambright received preliminary, conditional approval from Grand County for this subdivision plan. The proposed subdivision would be known as "Trail Mountain at Lake Granby" or "Lodges at Hudler Ranch." Due to declining market conditions, by 2006, Lambright decided not to go forward with the development and did not complete all conditions associated with the subdivision approval. Grand County never approved the final plat. Thus, Lambright would be required to resubmit any development plans to Grand County for approval to develop the residential subdivision. The Larger Parcel, however, could be divided into four 35-acre parcels without any approval from Grand County. (Gerken Depo., ECF No. 73-6, 142:20-22; Final Pretrial Order, Stipulations, ¶ 28.)

---

[1] 6.52 acres were taken for a transmission line estate and 1.59 acres were taken for the access road estate.

[2] *See Clayton Report*, ECF No. 65-3, p. 5, Bates 564. As used in this Order, unless otherwise stated, the page number references are to those in the document itself, rather than to the page numbers assigned to the document by the CM/ECF system.

[3] The United States did not revest, i.e., give back, the re-existing easements when it condemned the new easements.

For the last 10 years, the Larger Parcel has not been actively listed and there have been no offers to purchase or lease the entire Larger Parcel. At the time of the taking, the Larger Parcel was mostly unimproved agricultural land, essentially the same use as when Lambright purchased the property.

The sole issue in the case is the amount of just compensation for the property taken. This value is measured by the difference between the property's market value before and after the Date of Taking. *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 632 (1961). The parties offer differing opinions of this value. The motions request the Court to preclude some of this testimony based on various arguments. The Court addresses each motion in turn.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 ("Rule 702") requires a district court to ensure that an expert's testimony is admitted only if it is reliable and relevant. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). To do so, the court follows three steps.

First, the court must decide "whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Bill Barrett Corp*, 918 F.3d at 770 (quoting Rule 702).

Next, if the expert is sufficiently qualified, the court "'must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.'" *Id.* (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). In doing so, the court considers 1) whether "the testimony is based on sufficient facts or data"; 2) whether it "is the product of reliable principles and methods"; and 3) whether "the

expert has reliably applied the principles and methods to the facts of this case."  Fed. R. Evid. 702(b)-(d).

There are many factors which may bear on whether expert testimony is based on sound methods and principles, including the following: "whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community."  *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).  "'The focus, of course, must be solely on principles and methodology, not on the conclusions they generate.'"  *Id.* (quoting *Daubert*, 509 U.S. at 595).  And, where a court concludes there is too great an analytical gap between the data and opinion offered, it is not required to admit such opinion evidence.  *Schulenberg v. BNSF Railway Co.*, 911 F.3d 1276, 1283 (10th Cir. 2018).

Finally, after reliability, the court evaluates whether the testimony is relevant.  "Relevant evidence" is defined as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  That is, whether the testimony properly "fits" in the case.  "'Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'"  *Etherton*, 829 F.3d at 1223 (quoting *Daubert*, 509 U.S. at 591).

The trial court has discretion to determine "*how* to perform its gatekeeping function under *Daubert*."  *Bill Barrett Corp.*, 918 F.3d at 770 (emphasis in original).  A *Daubert* hearing is not mandated.  *Id.*

### III. ANALYSIS

#### A. The Motion to Exclude David Clayton's Testimony Regarding Three Sales

In the Tenth Circuit, "the best evidence of market value of real property in condemnation is, of course, found in sales of comparable land within a reasonable time before the taking." *United States v. 819.98 Acres of Land*, 78 F.3d 1468, 1471 (10th Cir. 1996) (brackets, quotation marks, and citations omitted). "Comparability is a question of fact, and the district court may exercise broad discretion in determining the admissibility of evidence of comparable sales." *Id.* "A dissimilarity between sales of property proffered as comparable sales and the property involved in the condemnation action goes to the weight, rather than to the admissibility of the evidence of comparable sales." *Id.* That is not to say, however, that the Court should abandon its responsibilities under *Daubert* to determine whether the proffered evidence is reliable in the first instance. Afterall, "[t]he threshold question of admissibility of comparable sales generally rests in the trial court's discretion." *United States v. 4.85 Acres of Land*, 546 F.3d 613, 618 (9th Cir. 2008). If the court finds sufficient similarities between the properties sought to be used as comparable and the subject property, then the jury should be allowed "'to determine for itself whether the described properties were in fact comparable to the condemned tract, and if found comparable, what weight should be given thereto.'" *United States v. 10.082 Acres of Land*, No. CV05-00362-PHX-NVW, 2007 WL 962846, at *4 (D. Ariz. Mar. 27, 2007) (quoting *United States v. 84.4 Acres of Land*, 348 F.2d 117, 119 (3d Cir. 1965)).

#### 1. The Clayton Report and Opinion

The first step to help identify potentially comparable properties is to identify the highest and best use of the property at issue, here, the Larger Parcel. *See The Appraisal of Real Estate* (14th ed. 2013) ("ARE") at 43. Mr. Clayton, Lambright's expert, determined the highest and

best use of the Larger Parcel was "interim hold and future large-lot residential development" before and after the taking.  (ECF No. 65-3, Clayton Report, at p. 21, Bates 580; ECF No. 65-1, Clayton Depo., 62:22-25, 63:9-11.)

Thereafter, Mr. Clayton used the sales comparison approach to develop an opinion of the market value of the subject property.  Under this methodology, the appraiser analyzes sales of properties similar to the subject property.  (ARE at 377.)  Here, Mr. Clayton selected six sales for analysis.  Three of the sales, Sales 3, 5, and 6 (collectively, the "Three Sales"), are part of the "Chimney Rock Cabins" located in an existing development known as C Lazy U in Grand County, Colorado.  The United States contends these Three Sales are not comparable to the subject property and, therefore, Mr. Clayton's testimony in reliance on these sales is unreliable and violates accepted appraisal methodology.  As such, the United States seeks to exclude these sales from consideration in determining market value.

## 2. The Three Sales

C Lazy U is a ranch development which consists of a guest lodge along with four vacation home communities with individual lots for sale.  (Clayton Depo., ECF No. 65-1, 98:2-9; 99:21-25-100:1-9; *see* ECF No. 65-9, pp. 6, 7.)  One of the four communities is Chimney Rock Cabins.  There is a total of 40 home sites (lots) in the ranch; each site is approximately 35 acres with a 1-2 acre building envelope.  (ECF No. 65-9, p. 6.)  As acknowledged by Joseph Lambright, the managing member of Lambright, C Lazy U is a "high-end neighborhood" (ECF No. 65-2, 137:7-14); it has thousands of acres and significant high-quality amenities such as horseback riding, hiking, fishing, skiing and tubing, and mountain biking (ECF No. 65-9, C Lazy

U website and brochure).  A purchaser of a lot in Chimney Rock Cabins must[4] purchase a ranch

membership which allows members access to such amenities.  The ranch membership is

exclusive; it is allowed only to purchasers of homesites.  (ECF No. 65-9, p. 7.)

The Three Sales at issue were sold on a per lot basis for $925,000 each.  The United

States asserts the Three Sales should be excluded as comparable sales because (1) they are not

comparable to the subject property due to differences in size, in development status, and in the

highest and best use; (2) Mr. Clayton failed to analyze the effect of the C Lazy U amenities on

such sales; and (3) Mr. Clayton's opinion failed to rely on sufficient facts and data and follow

accepted appraisal methodology.  In response, Lambright contends (1) the dissimilarities

between the Three Sales and subject property go to weight, not admissibility; (2) Mr. Clayton

accounted for the C Lazy U amenities in his analysis; and (3) Mr. Clayton considered sufficient

facts and data.  In reply, the United States reiterates the Court has gatekeeping responsibilities,

including a determination of whether the Three Sales lack "threshold comparability" to the

subject property.  The Court agrees with the first argument; therefore, it need not consider the

others.

First, there is a significant size difference in the properties – 35 acre lots versus a 154-

acre parcel.[5]  Next, there is a substantial difference in the development status of the Three Sales

and subject property.  The C Lazy U has already been subdivided and developed, the Three Sales

lots were ready for construction of new homes, and the lots are part of an existing larger "high-

end" development with a guest lodge and other significant amenities.  In contrast, the 154-acre

---

[4] The United States' position here has vacillated between its Motion and Reply brief, as it apparently received
additional information from its expert after the Motion was filed.  (*See* ECF No. 65, pp. 14-15 ("optional") and No.
81, pp. 8-9.)
[5] In this case, this fact, standing alone, would not necessarily preclude the Three Sales for use as comparable sales
because the 154-acre parcel may be subdivided into 35-acre lots without approval.  However, this fact does not stand
alone.

parcel was mainly unimproved, was not ready for immediate construction, and had no amenities. Finally, the highest and best use for each of the Three Sales was a home site in a luxury ranch development, with a 1-2 acre building envelope. According to Mr. Clayton, the highest and best use for the 154-acre parcel was interim hold and future large lot development, and the most probable buyer was someone who wanted to use it as a "trophy property" for a large single home, or the development of a residential subdivision of either 35-acre lots or higher density lots. Thus, the Court finds Mr. Clayton's use of these Three Sales would render his testimony unreliable.

Lambright raises several arguments to the contrary, but the Court is not persuaded. For example, Lambright contends the Three Sales are "sufficiently comparable" and, therefore, admissible as their differences go to weight rather than admissibility. But, the Court has found in the first instance that the Three Sales are not "sufficiently comparable" to the subject property. Similarly, Lambright argues Mr. Clayton accounted for the differences in the properties, including the availability of the high-quality amenities. But, the Court finds the differences are too wide to be accounted for reliably.[6] Thus, the Court finds the transactions are too dissimilar to the subject property to be used as comparable sales in the first instance. This does not, however, leave Mr. Clayton with no opinions to render as he also relied on three other sales. Accordingly, the Court finds Mr. Clayton may not testify regarding or use the Three Sales as comparable sales.

---

[6] Moreover, it is questionable that Mr. Clayton properly considered the impact of the amenities, thus rendering his opinion as to any adjustment for such amenities unreliable.

### B. The Motion to Exclude Mr. Clayton's Case Studies and Paired Studies Analysis

#### 1. *The Clayton Report and Opinion*

As discussed, Mr. Clayton used the sales comparison approach to develop an opinion of the market value of the subject property. Using the property sales he found comparable to the highest and best use of the subject property, Mr. Clayton estimated the fair market value ("FMV") of the 154-acre parcel at $15,000 per acre, disregarding the pre-existing power lines and the new power lines. Mr. Clayton thereafter applied a 10% downward adjustment to the $15,000 per acre FMV to account for the pre-existing power lines, resulting in a per acre value of $13,500[7] before the taking.[8] To determine the after-taking value, Mr. Clayton applied a downward adjustment of an *additional* 20% to account for the new power line.

To make these downward departures, Mr. Clayton relied, in large part, on a "paired sales analysis" and "case study analysis" he prepared no later than 2006 based on sales data from 1993 to 2004. The two analyses are based on the same data analyzed in two different ways.

With the case study analysis (also called the "trend analysis"), Mr. Clayton compiled data from four Colorado land developments with vacant lots which covered various price points, from entry level to luxury properties. Each development had a power line running through it, with some lots closer and other lots further removed from the line. Mr. Clayton compared lot sales proximate to the line with lot sales removed from the line to "extract the market impact of the line," if any. (ECF No. 66-1, Bates 612-13.) The following data is from Case Study No. 2, for lot sales between 1995-1998, and representative of Mr. Clayton's case study analysis:

---

[7] $15,000 x .90 (100% - 10%) = $13,500.
[8] The pre-taking value was then determined to be $2,080,000 (rounded) ($13,500/acre x 154.08 acres). (ECF No. 66-1, Bates 604.)

Non-Power Line Lots

| Sale Number | Lot No. | Months | Sale Price | Appreciation Factor | Time Adjusted Sale Price | Acres | $/Acres |
|---|---|---|---|---|---|---|---|
| 6 | 27 | -3 | $62,400 | -0.0063 | $62,010 | 40 | $1,550 |
| 7 | 20 | 14 | $66,400 | 0.0292 | $68,337 | 40 | $1,708 |
| 8 | 19 | 23 | $63,300 | 0.0479 | $66,333 | 40 | $1,658 |
| 9 | 8 | 1 | $65,000 | 0.0021 | $65,135 | 40 | $1,628 |
| 10 | 24 | 36 | $69,000 | 0.0750 | $74,175 | 40 | $1,854 |
| | | | | | | | |
| Total | | | | | $335,990 | 200 | $8,400 |
| Averages | | | | | $67,198 | 40.00 | $1,680 |

Power Line Lots

| Sale Number | Lot No. | Months | Sale Price | Appreciation Factor | Time Adjusted Sale Price | Acres | $/Acres |
|---|---|---|---|---|---|---|---|
| 1 | 6 | 14 | $39,900 | 0.0292 | $41,064 | 40 | $1,027 |
| 2 | 6A | 0 | $40,000 | 0.0000 | $40,000 | 40 | $1,000 |
| 3 | 15 | 5 | $40,000 | 0.0104 | $40,417 | 40 | $1,010 |
| 4 | 16 | 11 | $39,900 | 0.0229 | $40,814 | 40 | $1,020 |
| 5 | 14 | 13 | $40,000 | 0.0271 | $41,083 | 40 | $1,027 |
| | | | | | | | |
| Total | | | | | $203,378 | 200 | $5,084 |
| Averages | | | | | $40,676 | 40.00 | $1,017 |

With the paired sales analysis, Mr. Clayton compared vacant residential "large lot"[9] sales within a given subdivision with one another, "pairing" a lot sale with a condition to be measured (here, a transmission line) with a similar lot sale that does not have the condition. The data for this analysis is derived from the case study analysis. Pairing Number 1, below, is made from the data in Case Study No. 2 above and representative of the seven (7) paired sales Mr. Clayton used:

[9] The size of the paired sales lots ranged from 5.06 acres to 40 acres. (ECF No. 66-1, pp. 13-14, Bates 610-11.)

| Pairing Number 1- [ ] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Development/ Subdivision Name | Location (County) | Lot Identification | Sale Date | Site Size (Acres) | Proximate to Power Line | Time Adjusted Sale Price | Diminution in Value | |
| Grass Mesa | Garfield | Tract 15 | 11/97 | 40 | Yes | $40,417 | $27,920 per lot | 41% |
| Grass Mesa | Garfield | Tract 20 | 2/97 | 40 | No | $68,337 | | |

(ECF No. 66-1, Bates 610.)  The diminution in value is calculated by the difference in the two sales prices, which Mr. Clayton determined to be due solely to the power line.  It is these analyses (hereafter, collectively "Case Studies") which the United States argues is inadmissible and seeks to preclude from trial.  The Court addresses the United States' arguments in turn.

## 2. Preclusion under Fed. R. Civ. P. 37 for Violation of Fed. R. Civ. P. 26

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure provides that a retained expert must prepare and sign a report which "must contain" the following: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case."  The 2010 Notes of Advisory Committee on Rules state, as relevant here, that in amending "data or other information" to "facts and data" "the intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients.  The disclosure obligation extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert."  Fed. R. Civ. P 26(a)(2)(B) advisory committee's note to 2010 amendment.

Where a party fails to comply with Rule 26(a), the party is not allowed to use that information or witness to supply evidence at trial, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The determination of whether a "'violation is justified or harmless is entrusted to the broad discretion of the district court.'" *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)). In making this determination, the court should consider the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply*, 170 F.3d at 993; *see also Jacobsen*, 287 F.3d at 953 (same).

Mr. Clayton's Case Studies are intended to measure the diminution in value caused by the effects of power lines on market value. He did so by "comparing property sales having a similar condition to property sales that did not have the condition [here, the transmission line], assuming other characteristics are more or less equivalent." (ECF No. 74-6, pp. 9-10, Bates 608-09.) Here, the United States argues that Mr. Clayton has not, and cannot, disclose the "facts and data" he relied upon because he developed the case studies approximately 15 years ago and did not retain them.[10] Further, the United States contends it is prejudiced because, absent the underlying data, it is unable to cross-examine Mr. Clayton effectively concerning those portions of his opinions related to the Case Studies and whether such studies measured something different than the power line's effect on the market value of the lots examined. In other words, whether the "other characteristics" associated with the lots are "more or less equivalent" and, thus, whether the analyses are reliable.

---

[10] The information was apparently left with the company for whom Mr. Clayton was then working.

In response, Lambright contends Mr. Clayton's report complied with Rule 26, as confirmed by his deposition testimony. The Court's review of the record shows Mr. Clayton provided pictures of the transmission lines in each subdivision, maps (plats) of those subdivisions, and charts and summaries for those subdivisions setting forth the lots at issue, their size, their sales price, and information concerning the power lines at such locations. Mr. Clayton's report states that he personally confirmed all paired sales used and the sales in the four case studies (ECF No. 74-6, Bates 604, 609), statements which he confirmed during his deposition. While Mr. Clayton no longer has all his supporting data, the Court agrees that an expert's report need not contain, or be accompanied by, "all of the expert's working notes or recordings," or such information and detail to "replicate and verify in all respects both the method and results described in the report." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1121-1122 (D. Colo. 2006). Thus, the fact that Mr. Clayton does not have his notes or records of his verification data does not render his report deficient under Rule 26. Accordingly, the United States' request to preclude Mr. Clayton's use of the Case Studies for violation of Rule 26 is denied.

The Court's inquiry, however, does not end here. Whether Mr. Clayton's report is sufficient under Rule 26 of the Federal Rules of Civil Procedure is different from whether it is sufficient under Rule 702 of the Federal Rules of Evidence. Afterall, "[w]hether an expert's method or theory can or has been tested is one of the factors that can be relevant to determining whether an expert's testimony is reliable enough to be admissible." *Cook*, 580 F. Supp. 2d at 1122. The Court considers the United States' Rule 702 challenge next.

### 3. Preclusion as unreliable under Daubert

As stated, under Fed. R. Evid. 702, the court's inquiry includes 1) whether "the testimony is based on sufficient facts or data"; 2) whether it "is the product of reliable principles and methods." The United States challenges Mr. Clayton's Case Studies on both bases.

Specifically, the United States argues that in the absence of the verification data, the United States cannot know whether Mr. Clayton adequately verified the data and whether such data supported his conclusion that there is a diminution in value to real property due to proximity of electric transmission lines. In other words, whether Mr. Clayton sufficiently identified and accounted for confounding variables which may impact market value. Accordingly, the United States contends Mr. Clayton cannot show that his opinions based on the Case Studies are based on sufficient facts or data or are reliable. The Court disagrees as Mr. Clayton has provided sufficient information and the United States' challenge goes to the weight, rather than to the admissibility of Mr. Clayton testimony.[11]

It is undisputed that case studies and paired analysis may be an appropriate reliable appraisal practice. (*See* ECF No. 82, p. 9.) As the parties recognize, such analyses may inadvertently capture differences attributable to factors *other* than the studied characteristic (here, the effect of transmission lines). However, in this case, the Case Studies provided ample information and data necessary to analyze Mr. Clayton's conclusions and their reliability, e.g., the pictures and plats he relied on. Further, Mr. Clayton identified the variables he believed affect value, i.e., sales timing and the presence of power lines affecting the views. Moreover, the

---

[11] The Court is not making any finding in this Order that Mr. Clayton's *written* Case Studies or report is admissible.

United States was able to address any questions concerning Mr. Clayton's information and analysis during his deposition, including any sales verification conducted by Mr. Clayton.[12]

The United States relies on the loss of Mr. Clayton's original notes regarding the Case Studies, but the Court finds this does not support a contrary conclusion in light of the other supporting data and information which has been provided. The age of the study also does not necessitate its exclusion. As Lambright acknowledges, the absolute values shown in the Case Studies may be dated due to their age. It does not follow, however, that the analysis itself and its conclusion of relative impact are unreliable. The United States may raise challenges as appropriate at trial concerning the Case Studies. In summary, the Court finds Mr. Clayton's testimony is based on sufficient facts or data and, concomitantly, is the product of reliable principles and methods. Accordingly, the United States' request to exclude Mr. Clayton's testimony concerning the Case Studies pursuant to Rule 702 is denied.

### 4. Preclusion under Fed. R. Evid. 403

As a third basis for preclusion of the Case Studies, the United States argues the Case Studies have low probative value and are unfairly prejudicial and misleading. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury…."). The Court finds otherwise.

Here, the record shows the Case Studies are relevant on the issue of the impact of transmission lines to the value of the subject property. And, the Court finds, on balance, the Case Studies are not more unfairly prejudicial or misleading than probative. Here, Mr. Clayton's

---

[12] To the extent the United States contends the lack of written notes to show Mr. Clayton confirmed his sales verification affects the accuracy of his testimony, such a challenge is directed to his credibility and weight to be accorded his testimony.

Case Studies have substantial probative value on the single issue at hand – damages based on the impact of the transmission line. Any differences complained of in the lots analyzed in the Case Studies and the subject property go to the weight of the testimony. Further, Mr. Clayton explained his process for determining whether and how to adjust the sales he viewed. That Mr. Clayton's verification notes were lost[13] may affect the United States' ability to test Mr. Clayton's conclusions but not unduly so as there is other evidence to show what Mr. Clayton did and considered. Finally, the Court is not persuaded by the United States' argument that Mr. Clayton's use of numerical percentages would mislead the jury. The United States relies on *Borman v. Raymark Indus., Inc.*, 960 F.2d 327 (3rd Cir. 1992), but that case involved the sufficiency of expert medical testimony to support an apportionment of damages. In reviewing a defense argument in favor of apportionment, the *Borman* court noted a dissenting opinion's analysis that "requiring experts" to speak in numerical percentages introduces false precision as "[m]athematical exactitude is not found in the real world of science." Such, of course, is not the case here.

In summary, the Court finds Mr. Clayton's testimony concerning the Case Studies should not be precluded under Rule 403.

**C. The Motion to Exclude Landowner Evaluation**

*1. Mr. Lambright's Testimony and Opinions*

Mr. Lambright is a member and the manager of Lambright, the owner of the subject property, and he has opinions as to the value of the property taken. He was not disclosed as an expert witness in this case.

---

[13] There is no contention that any loss was intentional or otherwise, or that Mr. Clayton was required to take notes in the first instance.

In Mr. Lambright's opinion, the highest and best use of the 154-acre parcel at the time of taking was for a small lot (two acres) residential subdivision, essentially the 72-lot subdivision Lambright contemplated back in 2000-2005 and began "moving dirt" on but ultimately abandoned in 2006. And, Mr. Lambright opines, the value of the property taken was between $1.0 and $1.5 million based on his professional experience, reviewing of "comparable"[14] lot sales[15] information from 2016-2018 that he requested from a realtor after the taking, speaking to real estate agents about valuations of lots including the effect of power lines on property values, and viewing of the property in relation to the previously planned lots.

The United States' motion seeks to preclude all evidence on the hypothetical use of the subject property as small lot residential subdivision and of the valuation developed by Mr. Lambright. The United States asserts Mr. Lambright's conclusion of the highest and best use of the 154-acre property is speculative and, further, that his opinion of value should be excluded because it is based on such speculative use and because it is opinion evidence which does not meet the requirements of Rule 702. The Court agrees.

### 2. The Highest and Best Use

As stated, a property's market value depends on its highest and best use. *Olson v. United States,* 292 U.S. 246, 255 (1934). Where a landowner asserts the highest and best use is other than the current use that asserted use must be "*reasonably probable in the reasonably near future.*" *See U.S. v. Consolidated Mayflower Mines, Inc.*, 60 F.3d 1470, 1476 (10th Cir. 1995) (emphasis in original). Thus, proposed uses "that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably

---

[14] By this statement, the Court makes no findings or otherwise as to whether such lots that Mr. Lambright considered were comparable. That is not an issue the United States' motion raises as to Mr. Lambright's testimony.
[15] The number of lots sold and their prices.

probable" are to be excluded from consideration because that would "allow mere speculation and conjecture to become a guide for the ascertainment of value." *Olson* 292 U.S. at 257. Similarly, "if the future is beyond or very much beyond the near future, the use becomes speculative." *Consolidated Mayflower Mines*, 60 F.3d at 1477 (quotation marks and citation omitted).

In this case, Mr. Lambright's testimony that the highest and best use was residential development of approximately two-acre lots is speculative. His testimony is based on data from a realtor of 697 lots sales in the county from 2016-2018, of which Mr. Lambright concluded 187 sales were in the 154-acre property's market area. From this, Mr. Lambright "thinks" or "guesses" he would have gotten 5% to 10% of those sales if Lambright's development had been in placed at the Date of Taking. (ECF No. 67-2, 95:10-22, 173:22-25 to 174:1-9.) And, if Lambright had sold 10 lots a year at "$200,000 – name whatever number you want – 250, 150, brings me in 2 or $3 million a year in lot sales." (ECF No. 67-2, 95:10-25 to 96:1-2.) On the Date of Taking, however, the subject property was not subdivided, there were no plans for lots or lots in place, none of the lots were platted, and any small lot subdivision plans would require approval from Grand County (as Lambright's plans back from the mid-2000s never received final approval). Thus, Mr. Lambright has not shown the proffered highest and best use was "reasonably probable in the reasonably near future."

Mr. Lambright's "guess" that in 2017 Grand County would have approved in six months "more or less the same plan" from 2005 does not support a contrary conclusion. (*See* ECF No. 67-2, 158:159:9-23, 160:4-6.) Mr. Lambright provides no basis for such estimate as he has never spoken to anyone about the process for resubmitting the development plans. Further, Lambright's original plans had several conditions (most of which were apparently completed),

but Mr. Lambright does not know whether or to what extent such 2005 plans would have been acceptable to Grand County in 2017.  (ECF No. 67-2, 62:1-25 to 63:1-4.)

Mr. Lambright's testimony is also at odds with the use of the property at the time of taking.  Mr. Lambright's testimony is that the market in 2017 was ripe for the earlier development plans but there is no evidence that such plans were even remotely on or near the front burner.  Those plans were abandoned in 2005-2006 and were not re-started at any point.  In summary, the evidence shows Mr. Lambright's testimony as to the highest and best use is speculative.

### 3.  *The Opinion of Value*

The Unites States raises two arguments for the exclusion of Mr. Lambright's opinion of value.  First, that such testimony should be excluded because it is based on the speculative highest and best use.  And, second, because it is opinion evidence which does not meet the requirements of Rule 702.  In response, Mr. Lambright contends his opinion is not speculative, and is admissible as lay opinion under Fed. R. Evid. 701.  In the alternative, Mr. Lambright argues that if his opinion is subject to Rule 702, the Court should provide guidance as to what valuation testimony would be allowed or allow Mr. Lambright to supplement to comply with Rule 702.

To start, because the Court has found Mr. Lambright's opinion as to highest and best use speculative, it follows that his testimony as to the value is also inadmissible.  *See also* Fed. R. Evid. 402 (irrelevant evidence is inadmissible); 403 (relevant evidence is inadmissible where its probative value is substantially outweighed by confusing the issues or misleading the jury).  Even assuming, however, that Mr. Lambright's testimony was not speculative, the Court finds it is not admissible lay opinion.

The United States cites to *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207 (10th Cir. 2011) and its progeny in asserting that Mr. Lambright's proffered landowner testimony is not lay testimony but expert testimony. Mr. Lambright, however, argues that as a landowner he may offer valuation testimony without further qualification, relying on *United States v. 10,031.98 Acres of Land*, 850 F.2d 634 (10th Cir. 1988). Further, according to Mr. Lambright, *James River* did not (and could not) alter these conclusions. Contrary to Mr. Lambright's arguments, the Court finds *10,031.98 Acres of Land* does not stand for the proposition he seeks.

Specifically, the Tenth Circuit in *10,031.98 Acres of Land* stated that "'an owner, because of his ownership, is presumed to have special knowledge of the property and may testify as to its value.'" 850 F.2d at 636 (brackets omitted, quoting *U.S. v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966)). *James River*, however, recognized that *10,031.98 Acres of Land* suggested such testimony could be admitted under Rule 702, not Rule 701, *and* was decided before *Daubert, Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)*,* and the 2000 amendments to Rule 702. *James River*, 658 F.3d at 1215 n.1. Nonetheless, *James River* also suggested that "with proper foundation," landowner testimony may "in the appropriate case" be admitted as lay opinion under Rule 701. 658 F.3d at 1215 n.1. Such as if the landowner is testifying about value as a "'matter within his personal knowledge.'" *See James River*, 658 F.3d at 1215 n.1 (quoting *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009)). The testimony offered here, however, shows this is not an appropriate case.

Here, Mr. Lambright's opinion of value is not based on his observations as a property owner, nor could it be reached by any ordinary person. Instead, the record shows his opinion is based on his significant real estate background, his conversations with and his reliance on data

received from third parties (i.e., realtors), and the application of his own methodology of how to value the small lots Lambright previously proposed.  In sum, Mr. Lambright's testimony falls within the reasonings supporting preclusion under *James River*.  658 F.3d at 1214-1216 (landowner's valuation testimony was expert testimony where it required technical judgment, was based in part on his real estate professional experience, relied on outside technical analysis and conclusions of professional appraisal company, and Rule 702 generally considers landowner valuation testimony to be expert opinion).

This leaves the Court with Mr. Lambright's final contention which, in actuality, is a request for relief.  Here, Mr. Lambright requests that, if his opinion is subject to Rule 702, the Court provide guidance as to what valuation testimony would be allowed or allow Mr. Lambright to supplement to comply with Rule 702.  The Court declines to do so.  First, under D.C.COLO.LCivR 7.1(d), a motion shall not be included in a response to the original motion. Next, it is not the province of the Court to advise a party as to what testimony he (or it) may be allowed in the abstract as requested here.  It suffices to say that *James River* did not preclude the possibility of landowner lay testimony of value in all instances.  Finally, as to Mr. Lambright's request to "supplement," the time for expert designations has long passed but Mr. Lambright has not shown that late designation should now be allowed.  Thus, this request is denied.

IV.    **CONCLUSION**

Based on the foregoing, it is ORDERED

(1) That the United States' Motion to Exclude Certain Comparable Sales in the Appraisal of David B. Clayton (ECF No. 65) is GRANTED as stated herein;

(2) That the United States' Motion to Exclude Case Studies and Paired Sales Analysis of Appraiser David Clayton (ECF No. 66) is DENIED as stated herein; and

(3) That the United States' Motion to Exclude Landowner Valuation Evidence Premised

on Speculative Residential Use (ECF No. 67) is GRANTED as stated herein.

DATED this 30th day of July, 2019.

                                    BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge